## TRUSTEES *v.* STURGEON.

Testator devised one acre of land "for public use, school-house, meeting-house, and grave-yard," and the proceeds of certain lands "for the support and maintenance of a Presbyterian clergyman, who shall statedly officiate in a house of worship which may be erected on the acre of ground hereinbefore reserved for that and other public uses," provided a church was formed within three months after the death of his wife, and a house for worship built within a year thereafter. If the conditions were not complied with, the said proceeds were devised "for the use of the trustees of the General Assembly of the Presbyterian Church in the United States of America, and their successors, to be applied, under the direction of the Board of Education of the General Assem-

bly of said church, to the education of indigent and pious young men for the gospel ministry." At the time the will took effect there was but one General Assembly of the Presbyterian Church, of which the testator was a member. Subsequently a division took place, and two General Assemblies were formed. Two societies were formed, organized under the two General Assemblies, claiming to be the church intended in the will: The society which was lawfully organized under the regulation of that General Assembly which was the lawful successor of the original General Assembly, is entitled to the property.

Declarations of testator as to which church or what person he intended should take by his will are inadmissible, for there being but one General Assembly at the time, there is no latent ambiguity to be explained, arising from circumstances existing at the time the will took effect.

IN error from the Common Pleas of Erie.

This was an action of trespass, to try the right of two congregations to a piece of land devised for the use of a church, &c., in which a special verdict was found.

The will under which both parties claimed was, so far as is material, as follows :—After devising to his wife, for life, the proceeds of his farm, adjoining lands of Heiss et al., (" except one acre of land to be laid off for public use, school-house, meeting-house, and grave-yard,") the testator directed that the proceeds of the said lands "shall, after her decease, for ever be and remain as a permanent income for the support and maintenance of a Presbyterian clergyman, who shall statedly officiate in a house of worship, which may hereafter be erected on the acre of ground hereinbefore reserved, for that and other public uses; provided there is a church formed any time before or within three months after the decease of my wife, and a house for worship built in one year from said time; and when so complied with, my executors or surviving executor are hereby authorized and empowered to convey the same to the trustees of said church, and their successors, regularly chosen by the members of the church every year."

"And provided there is not a church formed and a house built agreeably to the proposal heretofore made, then and in that case the proceeds and avails of said land, after the time prescribed in the bequest to the church is up, shall be for the use of the trustees of the General Assembly of the Presbyterian Church in the United States of America, and to their successors, to be applied under the direction of the Board of Education of the General Assembly of said church, to the education of indigent and pious young men for the gospel ministry."

The verdict found, " That the plaintiffs are trustees of a Presbyterian congregation in the village of Fairview, organized on the 12th day of March, 1842, by the Erie Presbytery, in connexion

with the Synod of West Pennsylvania, and the General Assembly
of the Presbyterian Church in the United States of America, which
met in the First Presbyterian Church in the city of Philadelphia, in
May, 1838, under the circumstances as reported in the case of the
Commonwealth *v.* Green et al., 4 Whart. 531.  The said trustees
having been incorporated by the Court of Common Pleas, on the
12th day of November, 1842, and at the same time said church
was so organized, elders were regularly elected and ordained.  That
the Erie Presbytery met in Meadville in June, 1838, in pursuance
of a previous adjournment, and was duly organized and proceeded
to business.  There were a number of resolutions pending before
said Presbytery (but what these resolutions were, the jury is unin-
formed); upon the vote being taken on one of said resolutions, a
part of the members of said Presbytery, being the minority
thereof, withdrew from the place of business, and the majority part
of said Presbytery, is the same Presbytery under which the church
of which the said plaintiffs are trustees.  The Moderator, and the
stated clerk (being of the minority) withdrew, and carried with
them the records of the Presbytery, and organized in another
place, and after such withdrawal, the majority proceeded to the
election of a Moderator and stated clerk, and proceeded with busi-
ness.  Both Presbyteries profess to adhere to the same confession
of faith, and form of church government.  That one William
Sturgeon, on the 27th day of November, 1837, made his last will
and testament (*pro ut* said will) and died on the 17th of April,
1838, and said will was duly proved on the 18th of April, 1838.
That in pursuance of the provisions in said will, the plaintiffs, on
the first day of September, 1845 (having been previously duly
elected trustees under the provisions of said charter), entered upon
the acre of ground described in said will, as set apart for a school-
house, meeting-house, and burial-ground, and staked off a site on
said acre for a meeting-house.  And the said plaintiffs, on the first
day of February, 1846, built a fence around said lot of ground,
and that the plaintiffs commenced the building of their meeting-
house in the fall of 1845, and had the frame erected on said acre
of ground before the 17th of March, 1846, but not roofed nor
enclosed, and had the same finished on the 15th of July, 1846,
and that the said meeting-house was built on the ground fenced in
by the said plaintiffs as aforesaid.  That Margaret Sturgeon,
widow of the said testator, William Sturgeon, died on the 5th of
September, 1845.  That the Rev. Joseph Vance, a Presbyterian
clergyman, has officiated as pastor of said church from the 1st of

November, 1845, up to the present time; and that the meeting-house erected as aforesaid by the plaintiffs, has been the place of worship from the time it was finished up to this finding. That on the 17th of March, 1846, the said defendants, Samuel C. Sturgeon, Robert Kirk, William W. Eaton, Robert M. Sturgeon, and Jeremiah V. Sturgeon, entered upon the said acre of ground, within that part of it which had been fenced in by the said plaintiffs (which fence was down in places so that anything could go in and out), and left timber on said part of said lot, and that two of said trustees were in said lot on the said 17th of March, 1846, and forbade the said defendants coming on said ground, before said defendants entered thereon. That the defendants are the trustees and agents of an organized Presbyterian congregation or church in connexion with the Presbytery of Erie, Synod of Pittsburgh, and that Assembly claiming to be the General Assembly of the Presbyterian Church in the United States of America, which, in 1838, met and transacted its business in the Seventh Presbyterian Church, Ranstead Court, Philadelphia, under the circumstances reported in said case of the Commonwealth v. Green et al. That said congregation was organized, and elders therein ordained on the 21st of July, 1845, in pursuance of an application to the said Presbytery of Erie, and by a clergyman of that connexion by said Presbytery for that purpose appointed; which organization of said congregation or church, was on the 26th of August, 1845, adopted by said Presbytery, and on the 23d of September following, approved by said Synod. That the defendants entered upon said lot with their timber, &c., on said 17th day of March, 1846, for the purpose of erecting thereon a house of worship for said congregation, which entry is the act complained of by plaintiffs as a trespass. That the defendants proceeded with the erecting of such house of worship, and had the same completed within the time specified in a certain provision of the will of said Sturgeon, before mentioned, respecting the erection of a house of worship on the lot aforesaid, and specifying the time within which such house should be completed; that said house of worship was erected in pursuance of the provisions of said will, and has been from the time of its erection to the present time, used and occupied as the regular house of worship of said congregation. That for many years previous to the year 1838, and up to that year, the Presbytery of Erie had belonged to, and been under the supervision of the Synod of Pittsburgh, within the bounds of which it was, and is. That in September, 1838, the Presbytery under which plaintiffs' congregation was

organized, and the Presbytery under which the defendants' congregation was organized, each presented their rolls or records to the Synod of Pittsburgh, and that the rolls of the Presbytery under which the defendants claim organization, as the rolls of the Presbytery of Erie, were adopted, and those of the Presbytery under which plaintiffs claim organization, rejected by said Synod, with the allegation by said Synod, that they had received and adopted that of the Presbytery under which defendants claim organization. That from 1838 to the present time, the Presbytery under which defendants claim organization has been under the supervision of, and acknowledged by said Synod, as the Presbytery of Erie; and that the Presbytery under which plaintiffs claim, has not, since the said rejection of its rolls, been acknowledged by said Synod as the Presbytery of Erie. That the Erie Presbytery was originally formed by the Synod of Virginia, within the bounds of which it then was; and that when the Synod of Pittsburgh was formed out of a portion of the Synod of Virginia, the Presbytery of Erie fell within its bounds, and so remained up to the time of the transactions at Meadville in 1838, before mentioned, and that there has been no order by said Synod of Pittsburg, for the formation of the Erie Presbytery, since said transactions at Meadville. That by the constitution of the Presbyterian church, no new Presbytery can be formed within the bounds of a Synod without its order and approbation. That the General Assembly of the Presbyterian Church of the United States, under which the defendants' congregation is organized, has in connexion with it a Board of Education, whose object is the education of pious, indigent young men for the gospel ministry, and that the General Assembly under which the plaintiffs claim organization, has no such board, but had at the time of the alleged trespass, a Board of Education, but not of that name."

On the trial, the plaintiffs proposed to prove that William Sturgeon, the testator, belonged to the Springfield church, which was under the care of the Rev. Mr. Chamberlain, from 1829 to 1832; then became a member of the Girard church, under the charge of the Rev. Mr. Lockwood, and continued a member and an attendant at the Girard church until the time of his death; and that the incorporated church of Fairview, the plaintiffs in the case, is composed mostly out of the Girard church, and that the Girard church is in the New School connexion; and also offer to prove the declarations of the testator, as to what church he intended should receive the devise in his will: which was rejected, "because the

intentions of the testator cannot be made out by parol declarations, but must depend on the written will itself; and the other part of the offer is not a matter of dispute, but is admitted in substance."

The plaintiffs also offered to prove that the testator, before his death, named the persons who, he said, he intended should receive this donation he had made in the will, and that they are the same that compose the corporation, the plaintiffs.

On the trial, it was admitted that testator was a member of a Presbyterian church attached to the Erie Presbytery, in connexion with the Pittsburgh Synod and General Assembly, then known and acknowledged as such.

After the defendants closed the evidence on their part, the plaintiffs' counsel renewed their offer of the evidence mentioned in the first and second bills of exception, and it was rejected.

The court (CHURCH, P. J.) entered judgment for defendants.

*Marshall* and *Forward*, for plaintiffs in error.—This is a case of equivocation—of latent ambiguity, arising from two claimants of the devise, both having the same name, in which parol evidence of the intention of testator was admissible, to designate which should take : Powell *v.* Biddle, 2 Dall. 70 ; Greenl. Ev. 339, 340 n. § 289 to 291 ; Bailey *v.* Snyder, 1 Penn. Rep. 126 ; Verner *v.* Henry, 3 Watts, 384 ; Ziegler *v.* Eckert, 6 Barr, 18 ; 2 Kent Com. (6th ed.) 288 ; 16 Johns. 24 ; 6 Pet. 68 ; Burch *v.* Lehigh Navigation Company, 4 Rawle, 130 n.   An act of excision of congregations claiming their rights, cannot divest the rights of property, if there be no offence or cause of forfeiture : Presbyterian Congregation *v.* Johnson, 1 W. & S. 1.

*Babbitt* and *Walter*, contrà.—The synod refused to recognize plaintiffs, and this court will not reverse its judgments : Commonwealth *v.* Green, 4 Whart. 603.   The devise over shows that it was for the incorporated church : 3 Smith, 360.   We had an equal right, being the same in form and faith, &c., to enter, to perform conditions, and save the bequest.   The Assembly, under which plaintiffs claim, had no existence when the will was drawn, nor until after testator's death.   The offer to prove who were the individuals to take, is at variance with bequest to the corporation : 1 Greenl. § 289 ; App *v.* Lutheran Congregation, 6 Barr, 201.

*Oct.* 26.   COULTER, J. (after stating the evidence offered and rejected.)—The will was made on the 27th November, 1837, and

probate made thereof on the 18th April, 1838, one day after the death of the testator. By the 6th section of the act of 1833, on the subject, it is provided that every will shall be in writing; and the 13th section of the same act enacts that no will in writing, concerning real estate, shall be repealed, nor shall any devise or direction thereof be altered, otherwise than by some other will or codicil in writing. The provision in the 13th section is peculiarly marked and emphatic, and seems fully to establish that any parol evidence which would alter or change the will, or any clause thereof, from the interpretation that it ought to have received when it was written, and at the time of testator's death, is interdicted and disallowed. If the evidence offered to be given proposed no change or alteration in the clauses of the will, why was it proposed to be given? There is no ambiguity or uncertainty on the face of the will itself, nor in its terms. It is plain and clear, as matters without the will stood at the time it was written, and at the time of the testator's death; there is, therefore, no latent ambiguity. There was then but one General Assembly, one Presbyterian church professing the same faith, one hierarchy of that church, descending through all the grades from the sovereign power of the General Assembly down to the organization of each congregation. The temporal government of the church was a unit. The will, so far as this church is concerned, must operate and take effect as it existed at the time of the testator's death, corresponding exactly as it did with its identity when the will was made. Because the devise must, at that time, expend itself, and have something on which to operate. It then takes effect. Now, if there was anything corresponding exactly with the words of the will, and fulfilling all the exigencies of the clause according to the primary intent at the death of the testator, the clause would of course be applied to it. And the admission of parol testimony for the purpose of making it apply to some other thing of kindred quality and nature, would be altering the will by parol, and making it exist partly in writing, executed according to the statute, and partly in parol, contrary to the express enactment of the law. The testimony would therefore be excluded by the statute.

But passing by this view of the case, I will consider the matter as it would stand at the common law, or under the English statute of frauds and perjuries, which, in this particular, is merely declarative of the common law. There are two kinds of ambiguities; the one patent, the other latent. The first is, when the uncertainty exists on the face of the will; and, in such case, parol

evidence to explain it has never been admitted, because it could only be explained by putting other words or ideas into the will or in the mouth of the testator, and thus make a new will for him. The other is *ambiguitas latens*, where the words of the will are plain, consistent, and certain, and where the uncertainty arises from extrinsic facts or circumstances, either in relation to the property devised or the person who is entitled to take. In such cases of ambiguity, parol evidence is admitted in explanation of, and to designate the property or person designed by the testator; and there has been a great variety of cases decided on this subject, some of them conflicting, but which I will not examine, as it would unnecessarily swell this opinion. It is clear, however, from all of them, that the parol testimony on the subject, from behind the will, to be admissible, must relate to the situation of the property or person at the time the will was made. In illustration of this position, Lord Abinger observed, in Hiscocks *v.* Hiscocks, 5 Meeson & Welsby, 363, "To understand the meaning of any writer, we must first be apprised of the facts and circumstances of his allusions or statements; and if these are not fully disclosed, we must look to the works of contemporaneous authors." In that case, the devise was to testator's son John, and, after his death, "to his grandson, John Hiscocks, eldest son of the said John Hiscocks." John Hiscocks, the father, had been twice married; and by his first wife had a son, named Simon, and by his second wife a son, named John. Hence the latent ambiguity, extrinsic of the will; to explain which, parol testimony was admitted, to show who the testator intended—Simon, the *eldest*, or John, whose name agreed with the devise. In the case of Beaumont *v.* Pell, 2 P. Wms. 141, the question arose on a bequest to Catharine Earnly, and the name of a person who claimed the legacy, as being intended by the testator, was Gertrude Yardley. No person by the name of Catharine Earnly claimed the legacy, or was known to exist, when the will was made; and the court admitted evidence to prove that the scrivener made a mistake in writing the will, and substituted Catharine Earnly for Gertrude Yardley; observing, however, that it was of emphatic importance in the cause, that no such person as Catharine Earnly was known to exist when the will was made, nor claimed the legacy.

Part of the evidence proposed and rejected, is not denied but admitted; and that part which relates to the declarations of the testator, as to which church he intended the devise to benefit, and named the individuals and persons whom he intended to receive

the donation, would put new words and ideas into the will by parol. This testimony, if admissible, or if received, would not create an ambiguity *latent*, and arising from extrinsic circumstances existing at the time of making the will, or at the time of testator's death. The court must place itself, in case of latent ambiguity, in the situation of the testator at the time of making his will, and looking at the surrounding facts, with a knowledge arising from those facts alone, declare the meaning and construction of the will: Wigram on Wills, pro. 5, pl. 96, and Doe *v.* Martin, 1 Nev. & Man. 524. The New School connexion, as it is called in the case, did not exist at the time of making the will, nor at testator's death. Without, therefore, he possessed the gift of vatication, and looked darkly into the womb of futurity, he could not by possibility, or the law of nature, have had in his mind the separation of the Presbyterian Church into two separate branches, each claiming and establishing distinct governments, but professing the same principles; nor could he indicate the individuals who would belong to each or either branch; and if he could, it would be a devise to them, and not to the Presbyterian Church. There was nothing at the time of the testator's death, to which the devise could attach, but one Presbyterian Church; there was, therefore, no latent ambiguity. The evidence was properly and lawfully overruled; and this goes a great way towards ruling the cause. We must next, however, consider whether from the facts found in the special verdict, judgment ought to be entered thereon, in favour of the plaintiffs or defendants. [His honour here stated the facts found by the verdict.]

It is evident from this statement of facts, that the first and main question is, whether the plaintiffs are the representatives of such a church as the testator intended should receive the benefit of the devise, or not.

When the testator made his will, there was but one General Assembly in the United States; that was in November, 1837, and the same state of things continued until his death, in April, 1838. The disruption and formation of the second, or what is called the New School General Assembly, did not occur until May, 1838. The trustees of the old General Assembly, existing in 1837, were incorporated; and that this General Assembly was in the mind of the testator is evident from the fact of there being then but one alone, and also from the fact that he speaks of the trustees, and their successors, who should be elected by the General Assembly. The developement of facts then *in futuro*, could not have been present to his mind; for who can fathom and make palpable to sight and

mind the dark and shadowy events in the womb of time ? But if he had been gifted above other men, so. as to see and know things and events then in the dark abyss of the future, he would have provided for them in the written muniment of the charity—his lawful will—and thus prevented dispute or cavil. We take it therefore as a matter of irresistible conclusion, that the testator had in his mind and intention the then existing General Assembly, its organization and ecclesiastical government, down to the Presbyterian clergyman who was, in the language of the will, statedly to officiate in the church which was to be the recipient of his bounty. A "clergyman who statedly officiates," designates one who, either as regularly inducted pastor or as stated supply, acts by superior ecclesiastical authority. If, then, the testator had in his mind and intent the then existing General Assembly, in Nov. 1837, and its subordinate organization, does the General Assembly which sprung into existence in May, 1838, in the First Presbyterian Church, in the city of Philadelphia, represent or continue the old General Assembly of 1837 ? For if it does, the plaintiffs organized under it are entitled to the property. The question is fully resolved and answered by The Commonwealth v. Green et al. 4 Whart. 531. I need not state more of that case than this, that each party staked the regular organization of the conflicting General Assemblies upon the election of trustees, and this court sustained the election and appointment made by that Assembly, which by appointment of the old Assembly of 1837, met in the Seventh Presbyterian Church in 1838, and continued its session in the same place for that year. The closing paragraph of the opinion of this court, delivered by the Chief Justice, explicitly states the result of the decision in these words :—" The preceding observations are deemed enough to show the grounds on which we hold that the Assembly which met in the First Presbyterian Church was not the legitimate successor of the Assembly of 1837, and the defendants are not guilty of the usurpation of which they are charged." The defendants were the trustees elected and chosen, by what is called in common parlance the Old School General Assembly, and the relators were the trustees elected and chosen by the Assembly usually denominated the New School. The church represented in this case by the defendants is organized under the Old School, and the church represented by the plaintiffs is organized under the New School General Assembly. As the stream cannot rise higher than the fountain, the successive Assemblies, representing the Assembly which met in the First Church, in 1838, are not the successors of the Assembly of 1837,

which existed alone when the testator made his will. And as the plaintiffs claim organization under a New School Assembly, they do not fulfil the exigencies of the will, nor come within the intent of the testator. The Old School Assembly is lawfully in the possession of the archives and power of the old General Assembly, existing integrally before the disruption, and at the time of the devise, with the same ecclesiastical organization, and is its legitimate successor. The defendants organized under its authority are therefore the church designated by the devise.

In support of this view of the case, I may add, that the Presbytery of Erie, under which the plaintiffs are organized, applied to the old Synod of Pittsburgh, in the autumn of 1838, for recognition and adoption, thus manifesting that they believed it to be a true branch of the old hierarchy, but were not admitted, because the Presbytery under which the defendants are established as a church, had been previously recognised. We cannot decide, and do not undertake to determine, which branch or section of the old Presbyterian General Assembly is soundest in doctrine or purest in faith, or adheres most closely to acknowledged standards. These questions belong to another and a higher forum. We only decide as to identity and continuity of organization, so far as the right of property is concerned. That to which an individual has been long accustomed, and to which he has clung through life, is apt to be present to his mind in the closing hours of life and in *articulo mortis*, and is not relinquished without giving clear and unequivocal evidence of the fact. And when we have departed, and cannot speak for ourselves, such intention ought not to be imputed by the tribunals without satisfactory evidence. The testator died a member of the old Presbyterian Church; and in case the particular place of worship to which he intended his bounty to apply was not erected, he consigned the fund to the trustees of the General Assembly, to be disposed of by the Board of Education, through all time to come. This shows the location of his intent, and the settled purpose of his mind. The doctrine of Lord Eldon, in the case of The Attorney-General *v.* Pearson, 3 Merivale, 400, that it is the duty of the court to decide in favour of those, whether a majority or minority of the congregation, who are adhering to the ecclesiastical government of the church which was in operation at the time the trust was declared, is consonant with truth and nature, because it was on that which the mind of the donor rested. The case of App *v.* Lutheran Congregation, 6 Barr, 201, has a strong affinity in principle, though it does not reach the exact point. The

case of The Presbyterian Congregation *v.* Johnston, 1 W. & S. 1, was strongly insisted and pressed by the counsel for the plaintiffs. But it impinges no principle nor invades any rule settled by this decision. At the time of the grant by the Penns, who were the founders of the charity in that case, the General Assembly did not exist, and no particular ecclesiastical connexion was intended, other than that expressed in the deed, to wit, that the gift was to the Society of English Presbyterians in and near the borough of York. It was held that the majority of the congregation did not forfeit their charter or the charity by refusing or declining to adhere to one or either of the branches after the disruption of the General Assembly. The court say by the Chief Justice: " In conclusion, we are of opinion that no particular Presbyterian connexion was prescribed by the founders or established by the charter." And that is the gist and marrow of the decision. The deed of the founder was the polar star of decision there, which even the charter could not alter, and here the intent of the testator, in his last will and testament, gives the same steady and sure guide to reason and to justice. The judgment on the special verdict in favour of defendants is right, and the

Judgment affirmed.