McKean Estate.

Argued April 20, 1943. Before KELLER, P. J., BALD-RIGE, STADTFELD, RHODES, KENWORTHEY and RENO, JJ. (HIRT, J., absent)

614

*William McElwee, Jr.*, with him *Mareline McElwee*, for appellant.

*Robert White*, with him *Walter Lee Sheppard*, of *Foulkrod, Sheppard, Porter & Wadlinger*, for appellee.

OPINION BY KELLER, P. J., July 16, 1943:

William A. McKean, a resident of Little Beaver Township, near the Borough of Enon Valley, Lawrence County, died November 14, 1938, aged seventy-five years. He left a will, dated September 4, 1935, in which, after various specific bequests, he provided in the thirteenth item: "I leave the remainder of my estate, if any, to be equally divided between the Home and Foreign Mission Boards of the Fundamentalist Branch of the Presbyterian Church."

Since May 7, 1911 he had been a member of the Enon Presbyterian Church in Enon Valley, a congregation of the Presbyterian Church in the United States of America. In item six of his will he made a bequest of $2,000 to "Enon Presbyterian Church," the interest thereof to be used "for ministerial support indefinitely;" and in item seven, "I bequeath to the one who is Minister of the Presbyterian Church at the time of my decease, $100." Apparently he wrote the will himself.

The account filed by his administratrix c.t.a. showed a balance of $20,463.33, of which $19,081.81 had been ordered distributed, leaving $1,381.82, together with some unconverted assets, to be divided under the residuary clause (item 13) above.

Four bodies appeared, each claiming one-half of this balance, viz.:

1. Board of Foreign Missions of the Presbyterian Church in the United States of America.

2. Board of Home Missions, (since 1923 only a holding corporation under the Board of National Missions), of the Presbyterian Church in the United States of America.

3. The Independent Board for Presbyterian Foreign Missions.

4. Committee on National Missions of The Bible Presbyterian Church.

An auditor was appointed to hear the testimony of the several claimants, determine the facts as to the identity of the claimants named in the residuary clause of the will, and make a report recommending distribution of said residuary fund.

The auditor took the testimony, and made a well-considered and comprehensive report, in which he awarded one-half of the net balance for distribution to The Independent Board for Presbyterian Foreign Missions and one-half to the Committee on National Missions of The Bible Presbyterian Church.

Exceptions were filed by the other two claimants in the Orphans' Court of Lawrence County, which dismissed the controlling exceptions filed by the Board of Foreign Missions of the Presbyterian Church in the United States of America and sustained the controlling exceptions filed by the Board of Home Missions of that Church, and awarded one-half of the fund to The Independent Board for Presbyterian Foreign Missions and one-half to the Board of Home Missions of the Presbyterian Church in the United States of America.

The Committee on National Missions of The Bible Presbyterian Church appealed. The Board of Foreign Missions of the Presbyterian Church in the United States of America did not appeal.

616

The question turns on what the testator meant by the phrase, "The Home and Foreign Mission Boards of the *Fundamentalist Branch* of the Presbyterian Church."

The Stated Clerk of the Presbyterian Church in the United States of America, the highest executive officer of that denomination, appeared as a witness for the Boards of that church, and testified that he had never heard of a Fundamentalist Branch of the Presbyterian Church. In view of the overwhelming weight of the evidence we can only infer that he was giving too much weight to a narrow definition of the word "branch". The auditor and the court below very properly held that the word was used by the testator as a synonym for 'group', 'wing', 'faction', 'party', 'section', etc. It was so used by the Supreme Court of Pennsylvania in the case of *Trustees v. Sturgeon*, 9 Pa. 321, 329, 331 (1848), which grew out of a dispute between two groups, parties, or branches of the Presbyterian Church in the United States of America commonly known as 'Old School' and 'New School', over the 'Plan of Union' with the General Association (Congregational) of Connecticut. See also *Com. v. Green*, 4 Whart. 531, 581, 582, 598; *Presbyterian Congregation v. Johnston*, 1 W. & S. 9, 38, 39; Encyclopaedia Britannica, (11th Ed.) Presbyterianism, Vol. 22, pp. 292-3.

The word, 'Presbyterian', is used in two senses: One as a form of church government or polity; the other as a religious faith or doctrine, based on the Westminster Confession of Faith and the Larger and Shorter Catechisms. Any church denomination, or religious body, that accepts and conforms to *both* of these meanings has the right to call itself 'Presbyterian'. While the Presbyterian Church in the United States of America is the largest Presbyterian body in the United States, it has no monopoly of the name. In fact the Stated Clerk of that Church testified that there were 117 different Presbyterian bodies.

The present dispute is the result of a controversy that arose in the Presbyterian Church in the United States of America, its roots extending at least as far back as 1910.[1] It flared up in 1923; and again in 1929, when Dr. J. Gresham Machen and several other members of the faculty of the Theological Seminary at Princeton, N. J., resigned from that institution in protest against the alleged "Liberal" or "Modern" trend of its governing body, and established the Westminster Theological Seminary at Philadelphia. It came to a head in 1933, when the group, party, school, or branch led by Dr. Machen, which had popularly come to be known as 'Fundamentalists', objected to the 'Liberalism' or 'Modernism'[2] of the Board of Foreign Missions, and especially the attitude of certain of their missionaries in the foreign fields as respects the emphasis laid by them on the *social or ethical* teachings of Jesus and the neglect of the *religious*[3] implications inherent in them. We are not here concerned with either the correctness or the errancy of the charge. We are only attempting to state briefly and fairly the position taken by the Fundamentalists. No one who knew Dr. Machen can doubt the sincerity of his convictions. As a result, Dr. Machen and others of his party instituted "The Independent Board for Presbyterian Foreign Missions", designed to emphasize in the Foreign Mission field the *religious* message of Christianity, as contained in the accepted doctrinal standards of the Presbyterian Church, abovementioned.

---

[1] See Columbia Encyclopedia (1935) 'Fundamentalism', p. 678.

[2] The terms, as used in this connection, are indistinguishable. See *'Christianity and Liberalism'* by J. Gresham Machen (1929), p. 2.

[3] "The assumption that there can be found in the teachings of Jesus an ethical program which can be adopted by men and nations irrespective of the religious implications of his teachings is utterly without warrant. The Christian attitude is completely and inexorably religious." Umphrey Lee, "The Historic Church and Modern Pacifism," pp. 37-38.

This brought to the surface a long existent controversy or dispute in the Church, which was not confined to the Foreign Mission Board, but was general in its scope; the Fundamentalists claiming that men were being graduated from seminaries of the Church and ordained as ministers who did not accept the cardinal or fundamental doctrines of the Church as contained in the Confession of Faith and Catechisms, except with material mental reservations. Again we are not here concerned with the correctness of the claim, but only with the fact that it was made. It became the subject of disputation and contention in the General Assemblies of 1933 at Columbus, Ohio, of 1934 at Cleveland, of 1935 at Cincinnati and of 1936 at Syracuse, N. Y., and was finally resolved against the Fundamentalist branch or faction. In 1934 (May 25) the General Assembly *adopted* a report recommending the commissioners in the assembly to vote in favor of the following principles:

That the 'Independent Board for Presbyterian Foreign Missions' be directed to desist forthwith from exercising any ecclesiastical or administrative functions.

That all ministers and laymen affiliated with the church who are officers or members of the Independent Board be officially notified by the Assembly that they must immediately sever their connections with the Board.

That officers and members of the Independent Board be given ninety days to comply with the two previous principles or be disciplined.

In 1935 (May 26) the General Assembly unseated three of the Fundamentalist clerical commissioners because of their refusal to comply with the action of the General Assembly of 1934 which ordered them to sever their connection, as officers or members, with the Independent Board for Presbyterian Foreign Missions.

In the meantime, trials were held by ecclesiastical courts of various Presbyteries and Synods, of ministers and laymen of the Church who had refused to sever

their connection with the Independent Board for Presbyterian Foreign Missions, which resulted in the suspension of·seven clergymen, including Dr. Machen, for insubordination. Similar charges were brought against eight other clergymen and laymen, but their cases had not been disposed of by the time the General Assembly met in May, 1936.

At this meeting the General Assembly confirmed the action of the lower church bodies, and the appellant clergymen were adjudged guilty of the charge of Disobedience to the Constituted Authorities, and were suspended from the Church. Thereupon in June, 1936, they and other Fundamentalists withdrew from the Presbyterian Church in the United States of America and organized a separate church known as The Presbyterian Church *of* America.

Their right to use that name was successfully attacked by court action. On January 1, 1937 Dr. Machen died. Thereafter, the church of which he was the leader, being obliged to adopt a different name, in June 1937 split into two bodies, the one known as The Orthodox Presbyterian Church and the other as The Bible Presbyterian Church. The Orthodox Presbyterian Church made no claim to either of these funds. The Bible Presbyterian Church claimed the bequest to the 'Home Mission Board' on behalf of its 'Committee on National Missions', which corresponded to the Board of National Missions of the Presbyterian Church in the United States of America. It carries on its foreign missionary work through the Independent Board for Presbyterian Foreign Missions.

Three of these General Assemblies had been held before William McKean wrote his will. The evidence in the record shows the widespread notoriety which their action had obtained in the public press of the country. It also establishes the fact that William McKean was fully conversant with the dispute or controversy in the Presbyterian Church in the United

620

States of America and that his sympathies were with the Fundamentalist branch or party. The minister of the congregation to which he belonged, Reverend A. J. Koonce, was a Fundamentalist, and immediately following the General Assembly of 1934, he preached a sermon in which he referred to the controversy that had arisen in the General Assembly of that year, naming some of the individuals who were involved in that difficulty because of their connection with the Independent Board for Presbyterian Foreign Missions— among them, Dr. Machen, Dr. H. McAllister Griffiths, Rev. Carl McIntire and Rev. Merle T. MacPherson, the last three of whom were afterwards unseated as commissioners at the General Assembly of 1935, and were and are members of the Independent Board for Presbyterian Foreign Missions and are leading members of The Bible Presbyterian Church. Following that sermon, at the request of Mr. McKean, Mr. Koonce had an interview with him at his (McKean's) home to discuss the matter with him. The minister took with him an issue (January 3, 1934) of *The Christian Century*— described by him as "one of the leading modernist organs in the middle west"—which contained an editorial that emphasized the irreconcilable difference between Fundamentalism and Modernism.[4]

_____

[4] "Christianity according to Fundamentalism is one religion. Christianity according to Modernism is another religion. There is a clash here as profound and as grim as between Christianity and Confucianism. Amiable words cannot hide the difference. 'Blest be the tie that binds' may be sung till doomsday but it cannot bind these two worships together. The God of the Fundamentalist is one God; the God of the Modernist is another. The Christ of the Fundamentalist is one Christ; the Christ of the Modernist is another. The Bible of the Fundamentalist is one Bible; the Bible of the Modernist is another. The Church, the Kingdom, the Salvation, the consummation of all things—these are one thing to Fundamentalists and another thing to Modernists. Which God is the Christian God? Which Bible is the Christian Bible? Which Church, which Salvation, which Con-

The evidence fully justified the findings, and conclusions of the Auditor: That Mr. McKean's intention was that the funds arising from his residuary bequest should be administered by the so-called fundamentalist group. And that "The Independent Board for Presbyterian Foreign Missions was, in fact, a missionary board sponsored by the so-called fundamentalists; it is a going concern and it answers the description of the foreign mission board designated by the McKean will." (pp. 40a-41a).

The learned court below recognized this in holding (pp. 169a-170a): "We are in agreement with the Auditor's conclusion as to the foreign mission board intended by the testator ...... our testator gave to the foreign board of the Fundamentalist Branch of the Presbyterian Church. He used this language when there were no severed branches, only different groups, factions or branches within the church. One of these groups was termed, rightly or wrongly, the 'Fundamentalists'. The evidence is clear on this point. In church magazines, lay newspapers and in general parlance the terms fundamentalists and modernists were recognized. Furthermore, the fundamentalist group had established an independent board. It is idle to argue that this 'Independent Board for Foreign Missions' had no connection with the Presbyterian Church and meant nothing to it; because its formation and its claims upon the charity of Presbyterians were the cause of profound discussion and decisive action in at least three General Assemblies of the Presbyterian Church. The intention of the testator is the paramount consideration in construing this will: Prime's Petition, 335 Pa. 218, 222. The testator did not mention the established foreign board of his church although he

_summation, the future will tell, but the issue is clear, and that the inherent incompatibility of these two worships has passed the stage of mutual tolerance, is a fact concerning which there hardly seems room for any one to doubt." (Record, p. 319a)._

had taken the trouble to learn its correct name. He gave to the Foreign Mission Board of the Fundamentalist Branch of his church. We must, where possible, give effect to all this language and not throw away the word 'fundamentalist' unless no other clear course is open. The lack of an exact name is not fatal ...... It is the existence of the Independent Board for Presbyterian Missions at the time the will was signed which is decisive against the claims of the Foreign Mission Board of the Presbyterian Church ...... We are satisfied that William A. McKean intended his bequest to go to this Independent Foreign Board."

But the lower court refused to follow the Auditor in his findings and award in favor of the Home Mission Board (the Committee of National Missions) of The Bible Presbyterian Church, largely on the ground that as The Bible Presbyterian Church was not established as a denomination until June, 1937, the testator could not have had it in mind when he wrote his will on September 4, 1935, citing *Trustees v. Sturgeon,* 9 Pa. 321, pp. 329-330.

The testator knew of the threat of the General Assembly to discipline all ministers and laymen of the Church who refused to sever their connection with the Independent Board for Presbyterian Foreign Missions; of the unseating of three Fundamentalist clerical delegates or commissioners to the General Assembly of 1935 who were influential in that Board and had refused to sever their connection with it; of the charges of insubordination against leading Fundamentalist clergymen, including their leader, Dr. Machen, and their summons for trial on that charge; and of their *impending* withdrawal from the Presbyterian Church in the United States of America. He lived until November 14, 1938, when this withdrawal had come to pass, and a new Presbyterian Church had been founded by Dr. Machen and his associates, and he made no change in his will by eliminating his bequests to the

Home and Foreign Mission Boards of the Fundamentalist Branch of the Presbyterian Church.

The fact that The Bible Presbyterian Church was not in existence as an entity at the time the will was written is not conclusive. Under the evidence in the record, it, or a Fundamentalist branch of the Church, was clearly foreshadowed and in contemplation, and when it came into being it fulfilled the bequest of the testator.

The facts in this case are entirely different from those in *Trustees v. Sturgeon*, 9 Pa. 321, relied on by the court below and by the appellee. In that case William Sturgeon made his will on November 27, 1837 and died on April 17, 1838. He was a member of the Presbyterian Church at Girard, which belonged to the Presbytery of Erie and the Synod of Pittsburgh of the Presbyterian Church in the United States of America. By his will he directed that after the death of his wife, [which occurred on September 5, 1845] the proceeds of certain lands which he directed to be sold, should "forever be and remain as a permanent income for the support and maintenance of a Presbyterian clergyman, who shall statedly officiate in a house of worship, which may hereafter be erected on [a reserved acre of ground] provided there is a church formed any time before or within three months after the decease of my wife and a house of worship built in one year from said time ...... And provided there is not a church formed and a house built agreeably to the proposal heretofore made then and in that case the proceeds and avails of said land ...... shall be for the use of the trustees of the General Assembly of the Presbyterian Church in the United States of America, and to their successors, to be applied under the direction of the Board of Education of the General Assembly of said church," etc.

*After the testator's death,* a schism arose in the church due to a dispute between the Old School and New School branches or parties, as to which General

624

Assembly, held in Philadelphia in *May, 1838,* was the legal and valid General Assembly of that church—the assembly held in the Seventh Presbyterian Church (Old School) or in the First Presbyterian Church (New School). This was resolved by a *majority* of the Supreme Court in favor of the Old School General Assembly, held in the Seventh Presbyterian Church. See *Presbyterian Congregation v. Johnston,* 1 W. & S. 9 (1841). It was under those circumstances that the Supreme Court very aptly said in the Sturgeon case: "When the testator made his will, there was but one General Assembly in the United States; that was in November, 1837, and the same state of things continued until his death, in April, 1838. The disruption and formation of the second, or what is called the New School General Assembly, did not occur until May, 1838. The trustees of the old General Assembly, existing in 1837, were incorporated; and that this General Assembly was in the mind of the testator is evident from the fact of there being then but one alone, and also from the fact that he speaks of the trustees, and their successors, who should be elected by the General Assembly. The development of facts then *in futuro,* could not have been present to his mind; for who can fathom and make palpable to sight and mind the dark and shadowy events in the womb of time? But if he had been gifted above other men, so as to see and know things and events then in the dark abyss of the future, he would have provided for them in the written muniment of the charity—his lawful will— and thus prevented dispute or cavil. We take it therefore as a matter of irresistible conclusion, that the testator had in his mind and intention the then existing General Assembly, its organization and ecclesiastical government, down to the Presbyterian clergyman who was, in the language of the will, statedly to officiate in the church which was to be the recipient of his bounty."

But it is just as implicit in that opinion, that if the record had shown that the testator was aware of the controversy in the church growing out of the 'Plan of Union' with the Congregational Church [See *Com. v. Green*, 4 Whart. 531], and, favoring the New School side of the controversy, had made his will so as to provide that the proceeds of sale of the lands should be used for the support of a Presbyterian clergyman, who should statedly officiate in a house of worship, of the *New School branch* of the Presbyterian Church, to be erected on the acre of ground reserved for that purpose, without any gift over to the General Assembly, the decision would have been the other way.

In *Kramph's Estate*, 228 Pa. 455, 77 A. 814, the testator, Frederick J. Kramph died in 1858, having made his will dated November 30, 1854, in which he gave, devised and bequeathed his residuary estate, after the death of his widow, to seven named trustees, "in trust, for the purpose of endowing a university of the New Jerusalem, to be founded in the consolidated City of Philadelphia, for universal New Church education in these United States, and for the education of New Church ministers, who are to teach the doctrines of the New Jerusalem, as laid down in the writings of the Honorable Emanuel Swedenborg—said New Church University to be under the care and superintendence of a body of trustees rendered corporate by a perpetual charter legally obtained." The real estate was not sold and the account filed until 1908. It showed a balance for distribution of $51,785. This balance was claimed (1) by the Trustees named in the will and their successors in the trust duly appointed, to be held for the purposes set forth in the residuary bequest; (2) by the Academy of the New Church at Bryn Athyn, Pa., which claimed that it was incorporated under such circumstances as justified an award to it instead of to the Trustees of said residuary fund; and (3) by the

heirs and next of kin of Mr. Kramph who claimed that the purpose of the residuary clause was immoral because of the teachings in Swedenborg's book, 'Conjugial Love'. The court below upheld the contentions of the heirs and next of kin. The Supreme Court reversed and awarded the fund to the Academy, an institution incorporated in 1877—nineteen years after the testator's death—and controlled by the *General Church* of the New Jerusalem, a schismatic body of New Churchmen not connected with the *General Convention of the New Jerusalem* to which Mr. Kramph belonged, and *not in existence at the time of his death,* and which interpreted the "doctrines of the New Jerusalem, as laid down in the writings of the Honorable Emanuel Swedenborg" differently than the General Convention of which Kramph was a member and to which he subscribed.

It seems clear to us that the present testator not only intended, but also declared, that half of his residuary estate should go to the Home Mission Board of the *Fundamentalist Branch* of the Presbyterian Church. At the time of his *death* such a Home Mission Board of a Fundamentalist Branch of the Presbyterian Church was in existence, as the Committee of National Missions of The Bible Presbyterian Church. The Bible Presbyterian Church has the Presbyterian form of government, or polity, and accepts the Westminster Confession of Faith and the Larger and Shorter Catechisms. It may properly be said to be a Fundamentalist Branch of the Presbyterian Church; it includes the very men who were suspended from the Presbyterian Church in the United States of America, because they refused to resign from the Independent Board for Presbyterian Foreign Missions, which had been organized by the Fundamentalists in protest against alleged modernist tendencies and practices of the regular Foreign Mission Board.

Mr. Koonce, the pastor of Enon Presbyterian Church,

on July 15, 1939, withdrew from the Presbyterian Church in the United States of America, along with sixty of his parishioners, and founded The Bible Presbyterian Church of Enon Valley. The court below commented on this as follows: "Mr. McKean did not leave the Presbyterian Church with the first group of secessionists, when the church later known as the Orthodox Church was founded, nor did he leave when his own congregation was divided and the Bible Presbyterian Church of Enon Valley was formed. Thus it does too much violence alike to the rule construing the will as of the date of the death and to the actual facts of the situation to hold that McKean meant this committee of the Bible Church to take."

It is true that neither Mr. McKean nor any other member of the Enon Presbyterian Church—clergy or layman—withdrew from the Presbyterian Church in the United States of America in June, 1936, when Dr. Machen and a number of other prominent Fundamentalists withdrew and founded The Presbyterian Church of America. It is difficult for one layman, acting alone, to do much along that line, and the pastor of that church, as long as Mr. McKean lived, continued to be a Fundamentalist. He could not "leave when [in the language of the court below] his own congregation was divided and the Bible Presbyterian Church of Enon Valley was formed", for he was dead when that occurred and had been dead for eight months. But it is significant, in our opinion, that he lived for two years and five months after the threatened split occurred and the militant section of the Fundamentalists had withdrawn and founded The Presbyterian Church of America —which was subsequently split into The Orthodox Presbyterian Church and The Bible Presbyterian Church— and he did not change his will. The evidence shows that a number of well-known Fundamentalist ministers did not leave the Presbyterian Church in the United States of America with Dr. Machen and his following, but

that, no doubt, did not affect their Fundamentalism. They probably preferred to exert their influence inside the Church rather than out of it; but since 1923, at the latest, they were not in control of the General Assembly or of the mission boards of the church. There is nothing in the principles adopted by the General Assembly of 1934 which prevented a member of the Church from making contributions during his lifetime, or by his will, to the Fundamentalist wing or party of the Church, if he saw fit to do so. And in our opinion this testator clearly showed his intention in this respect, and it being his own money he could do as he willed with his own.

The basic facts in the record are not in dispute. It is the inferences deducible from them that are in issue. The first assignment of error is sustained. The decree of the court below is reversed, as respects the award of one-half of the fund to "Board of Home Missions of the Presbyterian Church in the United States of America", and the award of the Auditor of one-half of the fund for distribution to "Committee on National Missions of the Bible Presbyterian Church" is re-instated and affirmed.

The costs on appeal to be paid out of the fund.